UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT D. GORDON, RECEIVER OF THE
ESTATE OF GREGORY N. McKNIGHT,
LEGISI MARKETING INC., and LEGISI
HOLDINGS, L.L.C.,                                    Case No. 09-          -
                                                    Judge: Hon.
                    Plaintiffs,

        vs.

ELITE CONSULTING GROUP L.L.C., a
Florida limited liability company, IVAN
MONSALVE aka IVAN MONSALVES,
MARSHA FRIEDMAN, KAREN L.
REDMAN, TRICIA WITHERSPOON, JANE
DOE, JOHN DOE, and EDGETECH
INTERNATIONAL INC., a Nevada
corporation,,

                    Defendants.

## COMPLAINT

       Robert D. Gordon ("Gordon"), in his capacity as the Receiver for the Estates of Gregory

N. McKnight and Legisi Marketing, Inc., et al., through his attorneys, CLARK HILL PLC, states

his complaint against the Defendants Elite Consulting Group, L.L.C., a Florida limited liability

company, Ivan Monsalve aka Ivan Monsalves, Marsha Friedman, Karen L. Redman, Tricia

Witherspoon, Jane Doe, John Doe (hereinafter sometimes collectively referred to as the "Elite

Defendants") and Edgetech International Inc., a Nevada corporation as follows:

## PARTIES AND JURISDICTION

       1.      Gordon is the Receiver of the Estates of Gregory N. McKnight, Legisi Marketing,

Inc. and Legisi Holdings L.L.C., (hereinafter collectively referred to as the "Receivership

Estate"), pursuant to an order of May 5, 2008 appointing him in that capacity in the case of United States Securities and Exchange Commission vs. McKnight et al., United States District Court, Eastern District of Michigan, Case # 08-11887.

2.     Gordon is authorized to bring this action pursuant to 28 U.S.C §§ 754 and 1692, Fed. R. Civ. P. 66 and by the Court's May 5, 2008 Order Appointing Receiver.

3.     Gordon's principal place of business is located at 500 Woodward Avenue, Suite 3500, Detroit, Michigan 48226.

4.     Gregory N. McKnight ("McKnight") is a resident of Swartz Creek, Michigan.

5.     Legisi Marketing Inc., ("Legisi") is a Michigan corporation with its principal place of business located in Flint, Michigan.

6.     Elite Consulting Group, L.L.C. ("Elite") was at all relevant times a Florida limited liability company with a principal place of business located at 409 West Hallendale Beach Blvd., Suite 206, Hallendale, Florida 33009.

7.     Elite filed its Articles of Organization on September 1, 2006 and it filed Voluntary Articles of Dissolution on May 30, 2007.

8.     The manager and the registered agent of Elite at all relevant times was Karen L. Redman ("Redman") whose principal place of business at the present time is 2731 Executive Park Drive, Suite 4, Weston, Florida 33331.

9.     Ivan Monsalve aka Ivan Monsalves ("Monsalve") upon information and belief was a manager and member of Elite whose principal place of business at all relevant times was 409 West Hallendale Beach, Suite 206, Hallendale Florida and whose principal residence was 99 S.E. Mizner Blvd, Apt 931, Boca Raton, Florida 33432.  Monsalve directed Redman and NRAI

2

Services, Inc. ("NRAI") to form Elite on August 31, 2006 and to dissolve Elite on May 30, 2007. During the same time frame Monsalve directed Redman and NRAI to form and quickly dissolve other business entities in Florida, including Premier Asset Management Group LLC (withdrawal of authority to transact business on June 18, 2007).

10.    Marsha Friedman ("Friedman") was at all relevant times a member of Elite based on an unsigned Elite Operating Agreement prepared by Redman and/or NRAI for Elite at the direction of Monsalve. Friedman's principal business and residential address is 3060 N.E. 190th Street, Ste 201, Aventura, Florida 33180

11.    Upon information and belief Tricia Witherspoon ("Witherspoon"), Jane Doe and John Doe were the other managers, agents, employees, or members of Elite between September 1, 2006 and May 30, 2007 and the property and assets of Elite were distributed to these members and Monsalve and Friedman pursuant to the Articles of Dissolution filed by Redman as manager of Elite. At all relevant times the principal place of business of Elite, Monsalve, Friedman, Witherspoon, Jane Doe and John Doe was 409 West Hallendale Beach Blvd, Suite 206, Hallendale, Florida 33009.

12.    Edgetech International ("Edgetech") is a Nevada corporation with its principal place of business located at 4401 W. Tradewinds, Ste 201, Lauderdale By The Sea, Florida. Edgetech is the issuer of Edgetech stock which is traded over the counter and on the Pink Sheets under the trading symbol, "EGIL". Prior to April 2006 Edgetech was a shell company with no meaningful business operations. Edgetech is controlled by Lev Parnas, who owns approximately 72% of its shares. Parnas is the CEO and a former securities broker.

13.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

3

§ 1367(a) because it is related to Case # 08-11887 over which the Court has original jurisdiction so that the action forms part of the same case or controversy under Article III of the United States Constitution.

14.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because it is a case between citizens of different states and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

15.     This is an action alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(j) and 78(t), SEC Rule 10b-5, 17 C.F.P.R. § 240.10b-5 and the Securities Act of 1933, 15 U.S.C. § 77q(a). This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 754 and 1391(b).

17.     In accordance with 28 U.S.C. § 754 Gordon filed copies of the complaint and the order appointing receiver in the United States District Court for the Southern District of Florida.

**GENERAL ALLEGATIONS**

18.     On or about February 16, 2007, Witherspoon on behalf of Elite made a cold call from Florida to McKnight in Michigan to promote the sale of stock to McKnight. McKnight did not solicit the call and had no previous knowledge of Elite or Witherspoon. Witherspoon represented that Elite was a broker/dealer firm and was promoting and soliciting interest in the sale of the stock of Edgetech. Witherspoon represented herself as an agent, promoter, and representative for Elite and Edgetech, failed to disclose that neither Elite or Witherspoon were licensed to sell securities, and fraudulently represented her and Elite's legal authority to sell or

4

offer to sell securities. Witherspoon represented that another Florida broker/dealer firm, Sierra Equity Group was looking at purchasing the clientele of Elite. Witherspoon advised McKnight that there was an opportunity available for Edgetech stock and was soliciting McKnight's interest in purchasing the stock.

19.     Elite was not a registered broker dealer and Witherspoon, Monsalve and Friedman were not licensed to sell securities. Witherspoon falsely held herself out as a qualified, capable registered representative, able to recommend suitable investment advice.

20.     Following the telephone cold call by Witherspoon on behalf of Elite, Witherspoon mailed or faxed to McKnight, for the purpose of soliciting his interest in purchasing the stock of Edgetech, press releases regarding Edgetech and "The Edge", a product distributed by Edgetech. Witherspoon indicated that she wanted to talk with McKnight further about Edgetech and asked McKnight to call her after reviewing the Edgetech press releases.

21.     Elite and Witherspoon did not provide McKnight with a private placement memorandum or prospectus and did not ascertain whether or not he was an accredited investor prior to offering to sell to him shares in Edgetech.

22.     The press releases provided by Elite and Witherspoon to McKnight contain the following material misrepresentations and omissions among others:

A.     Edgetech had solidified a partnership with legendary music manager Lou Pearlman for the purpose of co-branding The Edge with the acts of one of Pearlman's companies, Transcontinental Records.

B.     Edgetech had distribution rights to The Edge under a long term marketing, sales and distribution agreement for which Edgetech has been granted rights in several exclusive

5

vertical markets "virtually world wide".

      C.   Edgetech was launching a new customer sales program beginning December 4, 2006 "to catch up on the backlog of requests for The Edge."

      D.   Edgetech displayed and demonstrated The Edge to tens of thousands of people at the 2007 Consumer Electronics Show and in early January 2007 was "making solid connections throughout the industry."

      E.   The Edge had 50,000 customer subscribers in November 2006 and an exclusive licensing agreement which "equals $millions$ in profits."

      F.   Edgetech "is on fire…urgent buy for huge profits!!"

      G.   Edgetech resembles an IPO-situation "whose time has come to explode onto the OTC market"… "with absolutely none of its intrinsic value reflected in the price of the stock."

      H.   Edgetech touted the imminent signing of partnerships with high profile celebrities and athletes to endorse Edgetech as the face and name behind the company "which will be like adding rocket fuel to EGIL's already blazing numbers!"

      I.   Edgetech represented that its growth and development was similar to the company behind Blackberry and Edgetech announced that the first 50,000 units of the Pocket Surfer to be in use by year end "which translates into 1 million per month profit!"

      J.   Edgetech's product is the lightest and fastest ultra mobile wireless device on the market today and "EGIL has cemented a major foothold in a $100M plus revenue stream."

      K.   Edgetech's "hockey stick projections for sales and subscribers without the burden of razor thin profit margins that have been dragging down the ISP's offer greater capacity

for stock appreciation than Canadian-based Research and Motion Limited (RIMM), the parent company of Blackberry."

      L.    "EGIL is a stock that will rise with such fury that all of Wall Street will be talking about it while sales ignite breakout profits, fanning the flames of a stock price explosion."

23.    On February 28, 2007 at 3:21 p.m., Elite and its agents forwarded an Edgetech Stock Purchase Agreement to McKnight by fax. The Edgetech Stock Purchase Agreement was an Edgetech draft from August 19, 2005, prior to the time that Elite was formed. McKnight executed the Stock Purchase Agreement which provided that Elite as the seller was selling 800,000 restricted shares of Edgetech for a total purchase price of $200,000.00 at a closing on March 1, 2007.

24.    Elite represented that it was the seller and the owner of the shares but upon information and belief Elite was acting as an agent or broker for Edgetech to promote and sell the shares of Edgetech.

25.    On or about February 28, 2007 at 3:25 p.m., Elite faxed to McKnight a Purchaser Questionnaire form related to the sale of the Edgetech shares. The form provided to McKnight was an accredited investor form as that term is defined in Regulation D and represented the shares will not be registered under the Act in reliance upon the exemptions from registrations afforded under the Act and will not be registered under the securities laws of any state in reliance upon similar exemptions. McKnight indicated he had not previously participated in private placements of securities.

26.    Subsequently McKnight received a call from an agent of Elite indicating that

more shares of Edgetech had been made available to Elite for purposes of sale and on March 2, 2007 at 9:53 a.m., Elite faxed to McKnight an Edgetech Stock Purchase Agreement for the sale by Elite to McKnight of 250,000 shares of restricted Edgetech stock for a purchase price of $62,500 with a closing date on the sale of March 5, 2007.

27.    On March 1, 2007, McKnight wired $200,000 to Washington Mutual Bank for the benefit of Elite Consulting Group, LLC and on March 2, 2007 McKnight wired $62,500 to Washington Mutual Bank for the benefit of Elite Consulting Group, LLC. The account at Washington Mutual Bank located at 240 E. Palmetto Park Road, Boca Raton, Florida was in the name of Elite Consulting Group, LLC, account number 3093485677.

28.    At sometime after April 16, 2007, Edgetech International Inc., issued stock certificate number 5430 to Gregory N. McKnight for 1,050,000 shares of restricted Edgetech stock.

29.    The press releases of Edgetech provided by Elite to McKnight were provided to him for the purpose of making an investment decision regarding the shares of Edgetech restricted stock.

30.    McKnight relied upon the material information contained in the press releases regarding the Edgetech restricted stock and the verbal representations made by Witherspoon and Elite.

31.    The representations in the press releases by Edgetech and the Defendants and the verbal representations made by the Elite Defendants and Witherspoon were materially false and omitted material information including, but not limited to, that Edgetech's distribution rights were limited to the US, Russia, Ukraine and the Caribbean.

8

32.     Elite and its agents failed to perform reasonable due diligence in reviewing the operations and financial status of Edgetech before offering to sell Edgetech restricted common stock to McKnight.

33.     Edgetech and its agents recommended a strategy which involved an over-concentration of McKnight's funds into one restricted security without proper diversification. The Defendants' material misrepresentations and omissions induced McKnight to invest in Edgetech restricted stock and as a direct and proximate result McKnight and the Receivership Estate have suffered economic losses.

34.     The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the material false statements and omissions alleged in this Complaint. Most of the specific statements pleaded herein were not identified as "forward looking" statements "when made." To the extent there were any forward looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements. Alternatively, to the extent the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward looking statement was authorized and/or approved by an executive officer of Edgetech who knew that those statements were false when made.

## FIRST CLAIM

**Against all Defendants for violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

35.    The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

36.    Defendants, as sellers, carried out a planned scheme and course of conduct which was intended and did (a) deceive McKnight and (b) cause McKnight to purchase Edgetech securities. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

37.    Defendants (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon McKnight in an effort to maintain artificially high market prices for Edgetech securities in violation of § 10(b) of the Exchange Act and Rule 10b-5. The Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

38.    Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business operations and future prospects of Edgetech and about the lack of licensing by Elite and Witherspoon.

39.    Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a

course of conduct as alleged herein in an effort to assure McKnight of the value of Edgetech stock, and Edgetech's performance and continued substantial growth which included the making of, or the participation in the making of, untrue statements of material facts and omissions to state material facts necessary in order to make the statements made about Edgetech, its finances, business operations and future prospects, and the licensing of Elite and Witherspoon, in the light of the circumstances under which they were made, not misleading, and engaged in practices and a course of business which operated as a fraud and deceit upon McKnight.

40.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Edgetech's operating conditions and future business prospects from McKnight and supporting the artificially inflated prices of its securities.  The Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the price of Edgetech common stock was artificially inflated.  In ignorance of the fact that the price of Edgetech stock was artificially inflated and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by the

11

Defendants, McKnight purchased Edgetech securities at artificially high prices and was damaged.

41.    At the time of the said material misrepresentations and omissions, McKnight relied upon the representations and was ignorant of their falsity and believed them to be true. Had McKnight known the truth regarding Elite and Edgetech, which was not disclosed by the Defendants, McKnight would not have purchased or otherwise acquired Edgetech securities or if he had acquired such securities he would not have done so at the artificially inflated prices which he paid.

42.    By virtue of the foregoing Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

43.    As a direct and proximate result of Defendants' wrongful conduct, Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech's securities from Defendants in the amount of $262,500 plus interest and costs. The Plaintiff tenders back the securities to the Defendants.

## SECOND CLAIM

**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF § 20(a) OF THE EXCHANGE ACT**

44.    The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.    Friedman, Monsalve, Redman and Witherspoon acted as controlling persons of Elite within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their ownership and participation in management of Elite's operations, these individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the

decision-making of Elite, including the content and dissemination of the various statements and omissions which the Plaintiff contends are false and misleading. Each of these Defendants had direct and supervisory involvement in Elite's day to day operations, are presumed to have had the power, and in fact exercised the power to control or influence the transactions giving rise to the securities violations as alleged herein.

46.     Elite, Edgetech and the individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged. By virtue of their positions as controlling persons, the individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech securities in the amount of $262,500 plus interest and costs.

### THIRD CLAIM

#### VIOLATIONS OF NEVADA UNIFORM SECURITIES ACT

47.     The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     Elite and Witherspoon, under the direction and control of the Elite Defendants, represented that Elite was a broker/dealer engaged in the business of effecting transactions in securities for the accounts of others. NRS 90.220.

49.     Edgetech was an issuer under NRS 90.255.

50.     Witherspoon represented that she was a sales representative of Elite and acting for Elite and Edgetech to effect the sale of securities in Edgetech to McKnight. NRS 90.285.

51.     Elite, Witherspoon, Friedman, Monsalve, Redman and Egdetech violated NRS

13

90.310 by Elite transacting securities business without being licensed, or exempt from licensing, and Witherspoon transacting securities business as a sales representative without being licensed, or exempt from licensing, and by Elite employing Witherspoon as a sales representative without being licensed.

52.    Upon information and belief the Defendants violated NRS 90.530 for the reason that this was not an exempt transaction.

53.    The Defendants violated NRS 90.570 for the reason that in connection with the offer to sell and the sale of Edgetech securities to McKnight, the Defendants, directly and indirectly, (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading in the light of the circumstances under which they were made; and (3) engaged in acts, practices or courses of business which operated as a fraud or deceit upon McKnight.

54.    As a direct and proximate result of the actions and omissions of the Defendants, the Defendants are liable to Plaintiff pursuant to NRS 90.660 for the reason that they offered and sold Edgetech securities to McKnight in violation of subsection 1 of NRS 90.310, upon information and belief, NRS 90.460, and subsection 2 of NRS 90.570.

55.    The Plaintiff tenders back the Edgetech securities to the Defendants and demands the consideration paid for the securities and interest at the legal rate allowed under the laws of the State of Nevada from the date of payment, including costs and reasonable attorney fees less the amount of any income received on the Edgetech shares.

56.    The individual Defendants, Friedman, Monsalve, Witherspoon and Redman directly or indirectly controlled Elite and materially aided in the acts, omissions or transactions

described above, which constitute a violation of NRS 90.660(1), and are jointly and severally liable to the same extent as Elite and Edgetech.  NRS 90.660(4).

57.   The Defendants also violated NRS 90.570 for the reason that under NAC 90.328 the Defendants engaged in the following acts or practices which operated as a fraud upon McKnight within the meaning of NRS 90.570:

A.   Contradicting and negating the importance of information contained in the Edgetech prospectus or other offering materials with the intent to deceive or mislead McKnight;

B.   Using the press release advertising in a deceptive and misleading manner in connection with the solicitation of the sale of Edgetech securities, recommending Edgetech restricted stock, which was a speculative low-priced security to McKnight without attempting to obtain information about the other securities held by McKnight, the financial situation of McKnight, and other data necessary to determine the suitability of the investment for McKnight and failing to disclose Elite's firm and ask price of Edgetech's restricted common stock at the time of the solicitation and at the time of the execution of the closings;

C.   Effecting two sales of Edgetech restricted securities and inducing the purchase of Edgetech restricted securities by McKnight by means of manipulative, deceptive or other fraudulent devices, including the use of boiler room tactics, or a fictitious or nominee account;

D.   Failing to comply with requirement for delivery of a prospectus or private placement memorandum.

58.   As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech

securities in the amount of $262,500 plus interest, costs and attorney fees.

### FOURTH CLAIM

**Against all Defendants for violations of Michigan Uniform Securities Act**

59.    The Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.    Elite and Witherspoon represented that Elite was a broker/dealer engaged in the business of effecting transactions in securities for the accounts of others, and that Witherspoon was an agent employed by a broker-dealer.

61.    Defendants materially aided in the sale and are liable under M.C.L. 451.810(b).

62.    Defendants violated M.C.L. 451.810, which provides that any person who offers or sells a security in violation of § 201(a) is liable to the person buying the security from him. Section 201(a) provides that a person shall not transact business in this state as a broker/dealer or agent unless registered under this Act. (M.C.L. 451.601(a))

63.    The Edgetech stock certificate delivered to McKnight was not registered under the Securities Act of 1933 and it was unlawful to sell the securities in Michigan unless the securities or transactions were exempt under Section 402.  Upon information and belief the transaction was not exempt under Section 402 because a registration statement was not filed with the State of Michigan, was not approved by the State of Michigan and was not provided to McKnight before or concurrently with the sale.  M.C.L. 451.810(a) and 451.802.

64.    The misrepresentations and omissions of the Defendants violated §§ 410(a)(1), 201(a), 301, and 412(g) of the Michigan Uniform Securities Act, M.C.L. § 451.810, .601, .701, and .812.  Defendants violated M.C.L. 451.810(a)(2) because they offered and sold Edgetech

securities by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, McKnight, exercising reasonable care, not knowing of the untruths or omissions, and the Defendants knew, or in the exercise of reasonable care, should have known of the untruths and omissions.

65.    As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech securities in the amount of $262,500 plus interest, costs and attorney fees. The Plaintiff tenders back the securities to the Defendants.

## FIFTH CLAIM

### Fraud

66.    The Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.    Defendants fraudulently sold Edgetech securities to McKnight by making material misrepresentations and omissions, including but not limited to:

A.    Edgetech had solidified a partnership with legendary music manager Lou Pearlman for the purpose of co-branding The Edge with the acts of one of Pearlman's company, Transcontinental Records.

B.    Edgetech had distribution rights to The Edge under a long term marketing, sales and distribution agreement for which Edgetech has been granted rights in several exclusive vertical markets "virtually world wide".

C.    Edgetech was launching a new customer sales program beginning December

17

4, 2006 "to catch up on the backlog of requests for The Edge."

       D.   Edgetech displayed and demonstrated The Edge to tens of thousands of people at the 2007 Consumer Electronics Show and in early January 2007 was "making solid connections throughout the industry."

       E.   The Edge had 50,000 customer subscribers in November 2006 and an exclusive licensing agreement which "equals $millions$ in profits."

       F.   Edgetech "is on fire…urgent buy for huge profits!!"

       G.   Edgetech resembles an IPO-situation "whose time has come to explode onto the OTC market"… "with absolutely none of its intrinsic value reflected in the price of the stock."

       H.   Edgetech touted the imminent signing of partnerships with high profile celebrities and athletes to endorse Edgetech as the face and name behind the company "which will be like adding rocket fuel to EGIL's already blazing numbers!"

       I.   Edgetech represented that its growth and development was similar to the company behind Blackberry and Edgetech announced that the first 50,000 units of the Pocket Surfer to be in use by year end "which translates into 1 million per month profit!"

       J.   Edgetech's product is the lightest and fastest ultra mobile wireless device on the market today and "EGIL has cemented a major foothold in a $100M plus revenue stream."

       K.   Edgetech's "hockey stick projections for sales and subscribers without the burden of razor thin profit margins that have been dragging down the ISP's offer greater capacity for stock appreciation than Canadian-based Research and Motion Limited (RIMM), the parent company of Blackberry."

L.    "EGIL is a stock that will rise with such fury that all of Wall Street will be talking about it while sales ignite breakout profits, fanning the flames of a stock price explosion."

M.    Elite and Witherspoon were licensed to sell securities in Michigan and the transaction did not require them to provide McKnight with a prospectus and registration statement.

68.    Defendants knew these misrepresentations or omissions were false when made, or made them recklessly without any knowledge as to their truth, and as positive assertions.

69.    Defendants intended McKnight to rely on these misrepresentations and omissions, and to induce him to invest $262,500.00 and he did so.

70.    As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech securities in the amount of $262,500 plus interest, costs, attorney fees and exemplary damages.

## SIXTH CLAIM
### Innocent Misrepresentation

71.    The Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.    Defendants fraudulently sold Edgetech securities to McKnight by making material misrepresentations and omissions, including but not limited to:

A.    Edgetech had solidified a partnership with legendary music manager Lou Pearlman for the purpose of co-branding The Edge with the acts of one of Pearlman's company, Transcontinental Records.

B.    Edgetech had distribution rights to The Edge under a long term marketing, sales and distribution agreement for which Edgetech has been granted rights in several exclusive vertical markets "virtually world wide".

C.    Edgetech was launching a new customer sales program beginning December 4, 2006 "to catch up on the backlog of requests for The Edge."

D.    Edgetech displayed and demonstrated The Edge to tens of thousands of people at the 2007 Consumer Electronics Show and in early January 2007 was "making solid connections throughout the industry."

E.    The Edge had 50,000 customer subscribers in November 2006 and an exclusive licensing agreement which "equals $millions$ in profits."

F.    Edgetech "is on fire…urgent buy for huge profits!!"

G.    Edgetech resembles an IPO-situation "whose time has come to explode onto the OTC market"… "with absolutely none of its intrinsic value reflected in the price of the stock."

H.    Edgetech touted the imminent signing of partnerships with high profile celebrities and athletes to endorse Edgetech as the face and name behind the company "which will be like adding rocket fuel to EGIL's already blazing numbers!"

I.    Edgetech represented that its growth and development was similar to the company behind Blackberry and Edgetech announced that the first 50,000 units of the Pocket Surfer to be in use by year end "which translates into 1 million per month profit!"

J.    Edgetech's product is the lightest and fastest ultra mobile wireless device on the market today and "EGIL has cemented a major foothold in a $100M plus revenue

20

stream."

K.    Edgetech's "hockey stick projections for sales and subscribers without the burden of razor thin profit margins that have been dragging down the ISP's offer greater capacity for stock appreciation than Canadian-based Research and Motion Limited (RIMM), the parent company of Blackberry."

L.    "EGIL is a stock that will rise with such fury that all of Wall Street will be talking about it while sales ignite breakout profits, fanning the flames of a stock price explosion."

M.    Elite and Witherspoon were licensed to sell securities in Michigan and the transaction did not require them to provide McKnight with a prospectus and registration statement.

73.    Elite made these misrepresentations and omissions in connection with the making of a contract for the sale of Edgetech securities to McKnight, they were false when made, McKnight relied upon the false representations and grossly negligent omissions and would not have entered into the contract if Elite had not made the misrepresentations and omissions.

74.    As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's entering onto the contract to purchase Edgetech securities in the amount of $262,500 plus interest, and costs, and the damages suffered benefited Elite and the other Defendants.

## SEVENTH CLAIM

### Violation of Florida Securities Transactions Act

75.    The Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.    Elite and Witherspoon represented that Elite was a dealer engaged in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person. 517.021(6)(a). F.S.

77.    Edgetech was a dealer under 517.021(6)(a). F.S.

78.    Witherspoon represented that she was a person employed and authorized by a dealer or issuer to sell securities. 517.021(2)(a). F.S.

79.    Elite, Witherspoon, Friedman, Monsalve, Redman and Egdetech violated 517.12 F.S. by Elite offering and selling securities without being registered, and Witherspoon offering and selling securities as an associated person without being registered, or exempt from registration, and by Elite employing Witherspoon as an associated person without being registered. Defendants are jointly and severally liable for the reason they personally participated in or aided in the making of the sale and the Plaintiff tenders back the consideration paid for the securities. 517.211. F.S.

80.    Upon information and belief the Defendants violated 517.061 F.S. for the reason that this was not an exempt transaction.

81.    The Defendants violated 517.301 F.S. for the reason that in connection with the offer to sell and the sale of Edgetech securities to McKnight, the Defendants, directly and indirectly, (1) employed devices, schemes and artifices to defraud; (2) obtained money by means

of untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading in the light of the circumstances under which they were made; and (3) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon McKnight. Defendants are liable to Plaintiff under 517.241(3). F.S.

82.     As a direct and proximate result of the Defendants' wrongful conduct, the Receivership Estate has suffered damages in connection with McKnight's purchase of Edgetech securities in the amount of $262,500 plus interest and costs.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff, Robert Gordon, Receiver for the Estates of Gregory McKnight, Legisi Marketing, Inc. and Legisi Holdings, L.L.C., requests the entry of a judgment against the Defendants, Elite Consulting Group, L.L.C., a Florida limited liability company, Ivan Monsalve aka Ivan Monsalves, Marsha Friedman, Karen L. Redman, Tricia Witherspoon, Jane Doe, John Doe and Edgetech International Inc., a Nevada corporation, jointly and severally in the amount of $262,500.00 plus interest from the time of sale, costs, attorney fees and exemplary damages, and whatever further relief is ordered by the Court.

Respectfully submitted,
CLARK HILL PLC

By:     _____
          Charles E. Murphy (28909)
          Edward J. Hood (P42953)
          Counsel to the Plaintiff
          151 S. Old Woodward Avenue, Ste. 200
          Birmingham, MI 48009
          (248) 642-9692
          (248) 988-2331 – fax
          cmurphy@clarkhill.com
Date:  March 2, 2009          ehood@clarkhill.com

23